Filed 5/6/15  In re Nevaeh G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Nevaeh G., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D066746 |
| Plaintiff and Respondent, | (Super. Ct. No. J517189) |
| v. | |
| REBECCA G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Martindill, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Rebecca G. appeals an order under Welfare and Institutions Code[1] section 366.26 selecting adoption as the permanent plan for her daughter, Nevaeh G., and terminating her parental rights. She contends that the court erred in finding that there was not a beneficial parent-child relationship between her and Nevaeh within the meaning of section 366.26, subdivision (c)(1)(B)(i) that precluded the termination of her parental rights. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2012, the San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of then six-year-old Nevaeh under section 300, subdivision (b) alleging that she was at substantial risk of serious physical harm or illness because of Rebecca's inability to provide regular care for her due to mental illness, developmental disability, or substance abuse.[2] The petition specifically alleged that Rebecca had used methamphetamine and alcohol to excess and had been arrested for being drunk in public on July 13 and July 20, 2012, and that Nevaeh was with her when

---

[1]     All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]     Effective June 20, 2014, subdivision (b) of section 300 was redesignated subdivision (b)(1). (Stats. 2014, ch. 29, § 64.) Subdivision (b)(1) provides, in relevant part, that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."

2

she was arrested on July 20. The petition further alleged that Rebecca had a history of substance abuse and had previously participated in two voluntary case plans and a prior dependency case for Nevaeh.

Officers from the San Diego County Sheriff's Department took Nevaeh into custody on July 20, 2012 when they responded to a domestic disturbance call involving Rebecca, who had thrown a bottle at a vehicle after someone in the vehicle called her a "crack head." The officers observed that Nevaeh was filthy and had severe eczema. Nevaeh told an officer that she had been walking all day and had eaten only two doughnuts that day. Rebecca was arrested for being drunk in public and Nevaeh was taken to Polinsky Children's Center. Rebecca admitted to an Agency social worker who met with her in jail that she had used methamphetamines and had smoked "spice," a synthetic form of marijuana, during the week that she was arrested.

The Agency's detention report summarized Rebecca's history with the Agency. Rebecca participated in voluntary services from February to September 2006 as a result of Nevaeh's testing positive for marijuana at birth. Rebecca did not test positive for drugs during the voluntary case, but she failed to follow through with other terms of her case plan. Another voluntary case was opened in October 2007 after Rebecca and the maternal grandmother engaged in a physical altercation that led to Rebecca's arrest. Rebecca completed a 90-day residential substance abuse program in that case, but failed to participate in outpatient substance abuse treatment or therapy, as she had agreed to do in her voluntary case plan.

3

The Agency took Nevaeh into protective custody and initiated a dependency case on her behalf in July 2008 due to general neglect after police found her with her maternal grandmother in the grandmother's bedroom during a search of the home, and found that the grandmother was in possession of methamphetamine. During the dependency case, Rebecca participated in therapy, home parenting services, and outpatient substance abuse treatment. The court terminated jurisdiction in that case in September 2010.

The Agency social worker spoke with Rebecca's first cousin, Valerie C., who said that she and Rebecca considered themselves sisters. Valerie went to Rebecca's home in December 2011 to pick up Nevaeh because Rebecca was not feeding or caring for Nevaeh. Valerie expressed concern about Nevaeh and said that Rebecca mentally and physically abused Nevaeh. Valerie cared for Nevaeh for a couple of months. She told the social worker that Rebecca had been using drugs since she was a teenager and that she had an alcohol problem that had recently increased. She thought Rebecca might need a mental health evaluation because she would "say random things."

The Agency reported in its jurisdiction/disposition report that Nevaeh was detained with Wendy T., a nonrelative extended family member (NREFM).[3] Rebecca told an Agency social worker that she had asked her aunt, Donna D., and Wendy T. to "come and get" Nevaeh because "she's being bad. I can't take care of her." Rebecca wanted Wendy to have legal guardianship over Nevaeh. She stated, "My kid is bad. She

---

[3] Section 362.7 provides that "[a] 'nonrelative extended family member' is defined as an adult caregiver who has an established familial relationship with a relative of the child . . . or a familial or mentoring relationship with the child."

4

needs her ass whooped and you guys won't let me do it." Wendy and Donna both expressed concern about Rebecca's mental health and her ability to consistently care for Nevaeh. Rebecca told the social worker that she thought she had a mental health problem, but she did not know what it was. She was happy with Nevaeh's placement with Wendy. She said that it was what she had wanted "for a long time," and that she had been trying to arrange it before the Agency got involved.

Nevaeh told the social worker that she called Wendy "Nana," and that she liked living at Nana's house because Nana took care of her. When asked what taking care of her meant, Nevaeh said that Nana fed her, bathed her, and helped her go to bed at night.

At the jurisdiction hearing, the court sustained the petition and made a true finding on the count under section 300, subdivision (b) by clear and convincing evidence. At a later disposition hearing, the court declared Nevaeh a dependent of the court, and removed her from Rebecca's custody. The court placed Nevaeh with an approved NREFM and ordered Rebecca to comply with reunification services.

The Agency's report for the six-month review hearing noted that Nevaeh remained placed with Wendy and that she reported feeling safe and loved in "Nana's" home. Wendy had been diligently attending to Nevaeh's medical and emotional needs.

Rebecca called the social worker in early September 2012 and reported that she was at the Isis House Crisis Center for the severely mentally ill. She had called a crisis line and was taken to a hospital where she was kept overnight before being released to Isis House. The hospital assessed her as presenting with depression and suicidal ideation.

5

Rebecca left Isis House on September 12, 2012. The next day, San Diego police officers took her to the San Diego County Psychiatric Hospital from the Jane Westin Center, where staff reported that she had been irritable and that there were concerns that she might pose a danger to others. She was discharged from the county hospital on September 20, 2012.

On October 10, 2012, Rebecca called the social worker from the Las Colinas Detention Center and reported that she had been arrested following a violent altercation with her ex-girlfriend, Janice K., after she (Rebecca) drank an entire 750 milliliter bottle of rum. Janice told the police that Rebecca had bitten her on the right forearm and would not let go. As a result, Janice suffered a laceration on her forearm that was approximately four inches long and two inches wide. Rebecca was arrested for mayhem and battery with serious bodily injury, but the district attorney's office declined to prosecute the case.

Wendy informed the social worker on October 19, 2012 that Rebecca had entered the "CRASH" program.[4] A staff member of the program named Robin told the social worker that Rebecca had admitted to smoking spice and using methamphetamine and alcohol days before her admission. Robin reported that Rebecca was "really out of it." She was making odd comments, not doing well with the other residents, and not following rules. Robin expressed concern that Rebecca might be in a drug-induced

---

4    The Agency states in its responding brief that CRASH is an acronym for Community Resources and Self Help.

psychosis. Approximately 20 minutes after the social worker's conversation with Robin, Robin called the social worker back to report that Rebecca had left the program.

Rebecca was readmitted to the county mental health facility on October 20, 2012 and was discharged on October 22. Medical records from her inpatient stay revealed that police took her there after they found her trespassing on private property in a psychotic state. She tested positive for "THC and benzos" and admitted to having used methamphetamine a few days earlier. At the time she was discharged, she was diagnosed as having a drug induced psychotic disorder with delusions, mood disorder, and dependence on alcohol, amphetamine, and cannabis.

On October 25, Rebecca entered a Christian faith-based, residential recovery program called Cornerstone Restoration Ranch (Cornerstone). On November 7, the director of Cornerstone told the social worker that Rebecca was "not in reality most of the time," and that Rebecca heard voices and asked if they were real. Rebecca was prescribed medications to treat psychosis, anxiety, and insomnia. On November 14, the director of Cornerstone reported that Rebecca was doing much better. As of the end of November, Rebecca was undergoing therapy and was consistently taking her prescribed medications. In January 2013 she tested negative for all substances screened in a drug test that the social worker requested.

In August 2012, the social worker completed the "Three Houses" exercise with Nevaeh, in which Nevaeh drew a "House of Good Things," a "House of Worries," and a

7

"House of Wishes." Nevaeh also added a "House of Sad."[5] Nevaeh's House of Good Things included her caregiver, a family friend, and the social worker. Her House of Worries and House of Sad included boys who made fun of her at school and a sad face of herself. In her House of Wishes she listed more friends, to be a fairy, a magical unicorn, and "a mom that doesn't threaten me," and drew a picture of herself smiling. Nevaeh had consistently told the social worker that she loved her mother and wanted more visits with her.

At the six-month review hearing, the court found that Rebecca had made substantive progress with her case plan and ordered the Agency to continue to provide her services. The court continued Nevaeh's NREFM placement.

The Agency's report for the 12-month review hearing filed on August 9, 2013 stated that Nevaeh had been on a 60-day trial visit with Rebecca since June 30, 2013. When the trial visit began, Rebecca was in the residential Cornerstone program. Rebecca left Cornerstone in July and on August 6, she and Nevaeh moved into a sober living facility through the McAlister Institute SAFE Housing Program. During that transition period, Rebecca consistently checked in with the Agency and showed that she was caring for Nevaeh's needs.

The Agency reported that Nevaeh's mental and emotional status had dramatically improved since the six-month review hearing. Nevaeh became immediately happier and

---

5       The social worker explained that the Three Houses exercises "is meant to elicit the voice of the child and [her] perceptions of what is working well in [her] life, what [she] is concerned about, and what [she hopes] will happen next."

her tantrums "practically ceased" after she began having unsupervised and overnight visits with Rebecca. In addition, enuresis and encopresis that Nevaeh had been experiencing lessened dramatically after she began to spend more time with Rebecca. Rebecca tested negative for substance abuse after she left Cornerstone, and she had been consistently participating in therapy.

At the 12-month review hearing on August 21, 2013, the court continued Nevaeh as a dependent of the court, but placed her with Rebecca. The court set a review hearing for February 18, 2014.

On January 7, 2014, El Cajon police responded to a call reporting that a woman (Rebecca) was striking a child and a second call from Rebecca reporting that a woman (the first caller) was following her in a vehicle. Nevaeh told the police that Rebecca had hit her on the arm and pushed her down when she refused to let go of a discarded Christmas tree that she wanted to take home. Rebecca had to forcibly pull Nevaeh away from the tree. After the incident, Nevaeh told a social worker that she felt safe with Rebecca and wanted to go home with her.

During an unannounced home visit on January 21, 2014, Rebecca was cheerful and engaging and told the social worker that she was doing better than she had been at the time of the incident on January 7, and was addressing with her therapist issues regarding disciplining Nevaeh and dealing with the loss of her mother.[6] Rebecca's therapist reported that Rebecca was doing well in therapy and had made great progress in

---

[6] Rebecca's mother had died the week before the January 7 incident.

9

controlling her anger. Nevaeh's mental and emotional status had continued to improve. She consistently told the social worker that she was happy and that she felt safe with her mother and wanted to live with her mother. The Agency recommended that the court place Nevaeh with Rebecca and terminate jurisdiction over her.

On February 27, 2014, the Agency filed a section 387 petition alleging that Nevaeh's placement with Rebecca had "not been effective in the protection or rehabilitation of the child." The petition alleged that from January 7, 2014 to the present, Rebecca had hit Nevaeh on several occasions and had threatened to physically harm her. Nevaeh had reported being hungry and having little or nothing to eat. On February 4, Nevaeh was prescribed an antibiotic for a urinary tract infection, but Rebecca had not picked up the prescription despite numerous attempts by the doctor's office to contact her. A relative picked up the antibiotics 10 days later. On February 24, Rebecca was hospitalized under section 5150 because she attacked a roommate. Rebecca had stopped attending meetings and drug testing at her sober living facility, and Nevaeh had reported feeling unsafe in Rebecca's care.

The Agency reported that it had received a referral stating that Rebecca and Nevaeh were living in a sober living facility for women and children, and Rebecca regularly got into arguments with other women at the facility. Rebecca had screamed, yelled, and cussed at the other women in front of Nevaeh, and stated, "If I had a fucking gun I would shoot up everyone in here." She had stopped participating in the program's meetings and drug testing. On February 24, she punched her roommate in the face, in

front of Nevaeh, when the roommate came out of the shower. Rebecca reported that her sister, who was not present, told her to do it. Rebecca then took Nevaeh into another unit where she (Rebecca) cornered a woman and appeared to be about to hit the woman when staff intervened. Police transported Rebecca to the hospital to be assessed.

The Agency filed a detention report stating that Nevaeh was detained with NREFMs Travis and Danielle H. The Agency reported that Nevaeh had witnessed all of Rebecca's irrational behavior and was "forced to make adult decisions all of the time." Nevaeh administered her own medications and breathing treatments for her asthma because Rebecca failed to do it. Nevaeh was constantly trying to explain and excuse Rebecca's behavior, telling people that Rebecca had been abused as a child and that was why she acted the way she did.

Nevaeh told the social worker on February 25, 2014 that Rebecca had hit her with a closed fist between the eyes and it hurt "really bad." She said that Rebecca had been hitting her all her life, but mostly on the butt. She told the social worker that she did not feel safe with Rebecca and did not want to go back to Rebecca. She raised her voice and added, "and you can tell anyone that." The Agency recommended that visitation between Rebecca and Nevaeh be supervised.

The Agency filed a jurisdiction/disposition report on March 19, 2014. The Agency reported that it had received a hotline referral on March 4 stating that Nevaeh had told her caregiver that someone had touched her "down there," and that it hurt, but she would not reveal who had done it. The Agency received another referral on March 5

11

stating that Rebecca had put her tongue on Nevaeh's private parts when Nevaeh was two years old and was sleeping. Rebecca told the reporting person that she felt very guilty about having done it, and that she did it to determine if anyone had abused Nevaeh. She explained that once she touched her tongue to Nevaeh's "privates," she would be able to tell if anyone had done that before. The next day Rebecca told the social worker that she had never licked, touched, or inserted anything into Nevaeh's vagina at age two or any other age, and that voices told her to say that she had licked Nevaeh's vagina. The voices told her that if she did not say it, she would have to do it.

Rebecca later told the social worker that all of her problems started when she stopped taking her medication in late October or early November, 2013. She could not recall what medication she had been taking, but she remembered that it helped her function day to day and that she did not hear voices while she was taking it. When the social worker asked her why she stopped taking the medication, she said, "I don't know, I just did not reorder." Rebecca's psychiatrist diagnosed her as having a psychotic disorder and being borderline bipolar. He prescribed her a medication to address the psychotic disorder and reduce her episodes of hearing voices. The Agency concluded that Rebecca's inability "to follow up on" Nevaeh's basic needs placed Nevaeh's health at risk.

At a jurisdiction hearing on March 25, 2014, the court made a true finding on the section 387 petition, removed Nevaeh from Rebecca's custody, and placed her with a NREFM. The court terminated Rebecca's reunification services and set a section 366.26 hearing.

12

The Agency's report for the section 366.26 hearing, prepared by social worker Crystal Irving, stated that Nevaeh was placed in a confidential NREFM's home where she had resided since February 25, 2014. Nevaeh presented as a "happy child with a dazzling personality." She consistently reported that she liked living with her current caregivers because she always felt safe and well cared for by them. She became visibly upset when she talked and thought about the trauma she experienced when she was a victim of sexual abuse.

Visits between Rebecca and Nevaeh had been supervised by the current confidential caregiver, who was advised to cancel a visit if Rebecca appeared to be under the influence of drugs or alcohol. Rebecca agreed to reschedule a visit if she was hearing voices, and she cancelled a visit in early March for that reason.

Social worker Irving supervised a visit between Nevaeh and Rebecca on May 2, 2014. Nevaeh said that she missed her mother because she was "like her big teddy bear." The visit went well and Nevaeh said that she "felt loved." When it was time for the visit to end, Nevaeh continued to hug Rebecca. The visit ended pleasantly and "Nevaeh walked to the car with a smile." Irving reported that "[t]here was no emotional display of sadness due to the visit ending." A visit on May 8 also went well. Irving reported that "Nevaeh appeared to be happy to have had a visit with her mother, as indicated by her smiling and hugging her mother." Irving again reported that Nevaeh displayed no emotion when Rebecca left.

13

Irving supervised a visit on May 25, 2014 at the drug and alcohol treatment facility where Rebecca was residing. Nevaeh sang, "mommy mommy mommy" as she and Irving approached the facility, and she was happy to see Rebecca. Rebecca and Nevaeh made Fourth of July lanterns together and then played together on playground equipment. Nevaeh jumped into Rebecca's arms and talked about school. Irving reported that when the visit ended, Nevaeh separated from Rebecca with ease and displayed no emotion.

Irving reported that Nevaeh's caregivers were married and had a son together, and were emotionally and financially secure. The female caregiver had known Nevaeh's family for over 30 years. She had watched Nevaeh grow and developed a strong bond with her over the years. She and her husband wanted to adopt Nevaeh to offer her the stability, safety, and permanency that Nevaeh needed. Nevaeh stated that if she could choose with whom she could live, she would choose her current caregivers. She said that she "always has food" and enjoyed having her own room, and that she felt "the safest with [her caregivers]" and never got hit.

Irving's assessment was that although Nevaeh loved and had an affectionate relationship with Rebecca, Rebecca had not shown that she played a parental role in Nevaeh's life. Nevaeh referred to Rebecca as "mommy" but, in Irving's view, "the relationship models that of a sibling relationship. They talk, laugh, and appear to enjoy each other's company, but there is no parenting demonstrated. Nevaeh looks to her current caregiver to get her needs met. [Rebecca] even looks to the current caregiver to

14

make decisions regarding Nevaeh, as indicated by her asking if Nevaeh can have a piece of candy." The Agency recommended that the court terminate parental rights and order a permanent plan of adoption for Nevaeh.

Rebecca filed a section 388 petition on July 23, 2014, requesting that the court change its order terminating her reunification services and setting the section 366.26 hearing, and enter a new order placing Nevaeh with her and either closing the case or providing further reunification services. As changed circumstances, Rebecca alleged that the allegations that she had sexually abused Neveah and neglected her by delaying medical treatment had been closed as inconclusive. Rebecca further alleged that she had entered KIVA (a drug and alcohol treatment program), all of her drug tests during her participation in the program had been negative, she continued to attend Alcoholics Anonymous and Narcotics Anonymous meetings and therapy, and she had completed an anger management class.

Irving filed an addendum report stating that the Agency opposed Rebecca's section 388 petition and continued to recommend termination of parental rights and adoption as Nevaeh's permanent plan. Irving noted that Rebecca had a long history of substance abuse that could not "be easily removed or ameliorated," and that Rebecca was "in the initial stage of recovery and is 'in progress' of addressing her substance abuse issues." Irving stated that the Agency commended Rebecca "for the progress she has made in treatment, however, she has not demonstrated to a significant degree that she has

15

alleviated the risks that led to Nevaeh's removal."  Irving reiterated her assessment that Rebecca had not played a parental role in Nevaeh's life.

Irving reported that Nevaeh's needs were appropriately and consistently being met in her current placement, and that Nevaeh had conveyed that she wanted to remain in her current placement because that was where she felt the safest.  Nevaeh's caregiver called Irving on July 24, 2014 and stated that Nevaeh had told her that she did not want overnight visits with Rebecca because she did not "have [her caregiver's] phone number to call if something happened."  Nevaeh told her caregiver that she did not want Rebecca to know where she lived because she was afraid that Rebecca would "come and beat her up in the middle of the night."  She said that she was not currently afraid of Rebecca because the caregiver was always with her.

Nevaeh also told her caregiver that one night at her grandmother's home, Rebecca told her that she (Rebecca) wanted a boyfriend.  Rebecca then proceeded to show Nevaeh what she wanted the boyfriend to do to her (Rebecca) by showing Nevaeh "nasty videos and . . . touching her private parts and sticking her fingers in it."  The caregiver asked Nevaeh if Rebecca had ever touched her like that.  Nevaeh said "no," Rebecca only touched herself.  Nevaeh added that "Robert did that sometimes."[7]  Rebecca later took her medication and told Nevaeh that she (Rebecca) "should not have done that."  When Irving asked Rebecca if she had touched her vagina in Nevaeh's presence or had ever

---

7      Irving had Nevaeh draw a "Safety/Permanency House" that included a list of people who were not allowed in the house.   On that list, Nevaeh identified "Robert" as "her's [sic] nona's son."

16

shown Nevaeh "nasty videos," Rebecca said she did "not recall." Rebecca told Irving that she believed that Nevaeh had fabricated those allegations because "Nevaeh never felt safe with [her], so she made it up so that she wouldn't have to [come] back with [her]."

The court denied Rebecca's section 388 petition on July 29, 2014, and held a contested section 366.26 hearing on September 25. The court received the Agency's reports in evidence and heard testimony from Irving and Rebecca. After hearing argument on the section 366.26 issues, the court found by clear and convincing evidence that Nevaeh was likely to be adopted and that none of the circumstances specified in section 366.26, subdivision (c)(1)(B) that would make termination of parental rights detrimental to Nevaeh existed. In its oral ruling, the court stated that it found "by the evidence presented that the relationship [between Rebecca and Nevaeh] is more of a friendly familial relationship, and it does not rise to the level of a parent[-]child bond that would outweigh the benefits of a permanent home." The court terminated parental rights and referred Nevaeh to the Agency for adoptive placement.

DISCUSSION

Rebecca contends that the court erred in finding that the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(B)(i), did not apply to preclude the termination of her parental rights. " 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.] 'Once the court determines the child

17

is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). [Citations.] Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." ' " (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1165.)

This court has interpreted "the 'benefit from continuing the parent[-]child relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

"A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence. [Citation.] It is not enough to show that the parent and child have a friendly and loving relationship. [Citation.] ' "Interaction between [a] natural parent and child will always confer some incidental benefit to the child. . . ." ' [Citation.] For the exception to apply, 'a *parental* relationship is

18

necessary[.]' [Citation.] ' "While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent. " ' " (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.)

We apply the substantial evidence standard of review to the factual issue of whether there is a beneficial parent-child relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination of parental rights would be detrimental to the child. (*In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) The latter determination "calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption . . . ." (*In re J.C.*, *supra*, at p. 531.)

In applying the substantial evidence standard of review, we do not consider the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610; *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1346.) On appeal, the parent has the burden of showing that there is no evidence of a

sufficiently substantial nature to support the court's finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

We conclude that Rebecca has not met her burden of establishing that the beneficial relationship exception to adoption applies. The evidence sufficiently supports the court's finding that Rebecca's relationship with Nevaeh did "not rise to the level of a parent[-]child bond that would outweigh the benefits of a permanent home." Irving's assessment was that Nevaeh loved Rebecca and that their relationship was affectionate, but Rebecca had not shown that she played a parental role in Nevaeh's life. Irving stated that "the relationship models that of a sibling relationship. They talk, laugh, and appear to enjoy each other's company, but there is no parenting demonstrated." The court was entitled to find Irving's opinion credible and to give great weight to her assessment. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)

As noted, to overcome the preference for adoption and preclude termination of parental rights at a permanency plan hearing, the evidence must support a finding that "severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that *the child would be greatly harmed . . . .*" (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, italics added.) Even assuming that the evidence shows the existence of a parent-child relationship between Rebecca and Nevaeh that provided some benefit to Nevaeh, we conclude that the court could reasonably find that severing the relationship would not cause Nevaeh to be greatly harmed.

Throughout the dependency proceedings, Nevaeh repeatedly focused on her own safety, frequently stating that she felt unsafe with Rebecca and that she felt safe in her NREFM placements, and that her needs were met in those placements. Nevaeh reported feeling safe and loved in Wendy's home. After Rebecca was hospitalized under section 5150 in February 2014 because she attacked a roommate, Nevaeh told a social worker that she did not feel safe in Rebecca's care. She consistently reported that she liked living with her current caregivers because she always felt safe and well cared for. She did not want overnight visits with Rebecca because she did not "have [her caregiver's] phone number to call if something happened." She told her caregiver that she did not want Rebecca to know where she lived because she was afraid that Rebecca would "come and beat her up in the middle of the night." She said that she was not currently afraid of Rebecca because the caregiver was always with her. Rebecca herself admitted to Irving that Nevaeh "never felt safe with [her]," and that she believed that Nevaeh fabricated allegations that she (Rebecca) had engaged in inappropriate sexual conduct because Nevaeh did not want to be returned to her custody.

At the section 366.26 hearing, Irving testified that her opinion about the relationship between Rebecca and Nevaeh was affected by reports that Nevaeh had "nightmares that her mother would come in and beat her up in the middle of the night" and that Nevaeh had sometimes "soiled herself due to her fears regarding the relationship with her mother." Irving testified that recent anxiety Nevaeh had been exhibiting was "directly related to [Nevaeh's] fear of being placed with her mother." Irving further

21

testified that Nevaeh was "very concerned about not wanting to hurt her mother's feelings . . . ." Irving believed that Nevaeh "want[ed] to see her mom as a friendly visitor, because she's stated that she doesn't want to be in her care full time and have that maternal type of relationship."

Nevaeh stated that if she could choose with whom she could live, she would choose her current caregivers. She said that she "always has food" and enjoyed having her own room, and that she felt safest with her caregivers and never gets hit. Nevaeh had asked her current caregivers if she could call them mom and dad, and had asked that her last name be changed to their last name. Irving believed "that even if [Nevaeh] becomes sad around the fact that visits [with Rebecca] are being discontinued, in the long run in will definitely benefit her to be adopted by her caregivers." The evidence in the record amply supports a finding that severance of Nevaeh's parent-child relationship with Rebecca would not cause Nevaeh to be greatly harmed, even if Rebecca occupied a parental role in Nevaeh's life. Accordingly, substantial evidence supports the court's finding that there was not a parent-child relationship between Rebecca and Nevaeh that would outweigh the benefits of adoption.

## DISPOSITION

The order terminating parental rights and selecting adoption as the permanent plan for Nevaeh is affirmed.

AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McDONALD, J.